<pre>
 1                   UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                         (Asheville Division)

 3
    ---------------------------x
 4  UNITED STATES OF AMERICA,   :
                Plaintiff,      :
 5                              :
                                :
 6  vs                          :Criminal Action:1:16-CR-05
                                :
 7  JUSTIN NOJAN SULLIVAN,      :
                Defendant.      :
 8  ---------------------------x

 9
                                 Tuesday, June 27, 2017
10                               Asheville, North Carolina

11
           The above-entitled action came on for a Sentencing
12  Hearing Proceeding before the HONORABLE MARTIN K.
    REIDINGER, United States District Judge, in Courtroom 1,
13  commencing at 9:05 a.m.

14
           **APPEARANCES**:
15         On behalf of the Plaintiff:
           **MICHAEL E. SAVAGE, Esquire**
16         U. S. Attorney's Office
           227 W. Trade Street
17         1700 Carillon
           Charlotte, North Carolina  28202
18
           **GREGORY R. GONZALEZ, Esquire**
19         United States Department of Justice
           950 Pennsylvania Avenue, NW
20         Washington, D. C.  20530

21         On behalf of the Defendant:
           **FREDILYN SISON, Esquire**
22         Federal Defenders of WNC
           1 Page Avenue, Suite 210
23         Asheville, North Carolina 28801

24
    Tracy Rae Dunlap, RMR, CRR              828.771.7217
25  Official Court Reporter
</pre>

1
**I N D E X**

**DIRECT**     **CROSS**     **REDIRECT**

Dr. James Hilkey........15......25.........31

**E X H I B I T S**

Page
Government's Exhibits 1 through 19............14

Page
Reporter's Certificate .......................78

**P R O C E E D I N G S**

THE COURT:  The other matter that we have on the calendar for today is the case of United States versus Justin Nojan Sullivan which is before the Court for the sentencing of the defendant pursuant to his plea of guilty and, also, for the hearing with regard to the acceptance of the plea agreement under Rule 11(c)(1)(C). on the charge of Attempted Act of Terrorism Transcending National Boundaries, in violation of 18, U.S.C., Section 2232b(a)(1), (a)(2), and (c)(1).

Ms. Sison, good morning.

MS. SISON:  Good morning, Your Honor.

THE COURT:  Is the defendant prepared to proceed?

MS. SISON:  Mr.  Sullivan is, sir.

THE COURT:  Okay.  Mr.  Savage, good morning to you.

MR.  SAVAGE:  Good morning, Your Honor.

THE COURT:  Is the government prepared to proceed?

MR.  SAVAGE:  Yes, Your Honor.

THE COURT:  As far as this hearing is concerned, the way I would propose to proceed is since the Rule 11 hearing was conducted by me, rather than by a magistrate judge, there's no need for the completion of the Rule 11. So, then, the next thing I would do would be to move on to the questions regarding the completion of the

1  presentence report.  And then, if there is any evidence

2  that is to be presented by either side, we would move to

3  that evidence and then to arguments and the elocution

4  before I make my ruling regarding the acceptance of the

5  agreed sentence.

6       Mr.  Savage, did you envision us proceeding in any

7  different manner?

8       MR.  SAVAGE:  No, Your Honor.  And I was going to

9  defer to the Court.  Just to let the Court know, we have

10 -- as the Court is aware, the government filed a

11 sentencing memorandum, which is Document 66, with various

12 exhibits.  We are prepared to rely on that as the

13 government's proof and offer those exhibits into

14 evidence.  We also have witnesses present.  Since the

15 Court is the decider and the trier -- the finder of fact

16 in this particular matter, we'll defer to the Court as to

17 how you want us to proceed.

18      THE COURT:  Are you saying that if the Court

19 receives the exhibits that are attached to your

20 sentencing memorandum that that would dispense with the

21 need for the calling of any witnesses?

22      MR.  SAVAGE:  Yes, Your Honor.  And I think that

23 in combination with the factual resume which has, as you

24 know, several disputed paragraphs but has a number of

25 facts in it which we rely on to reach the conclusion.  So

the findings in the disputed portions of the presentence
report. You know, Your Honor, I think it depends on
whether the Court finds the evidence is sufficiently
reliable under the rules for sentencing to consider the
documentary proof and the proffer or whether the Court
wishes to have further evidence. Either way, we're
prepared to proceed.

THE COURT: Okay. Ms. Sison. First, let me ask
you, do you have a view that we should proceed in a
manner that is different from what I outlined?

MS. SISON: No, Your Honor. And just to address
the government's position as far as the presentation of
the evidence that is the attachment to its sentencing
memo. We would not object to that although, obviously I,
still maintain that Mr. Sullivan does not admit any of
the controverted facts regarding the William Clark case.
As you know, that case is still pending. And, so,
whatever they do present, I understand the Court will use
it or not use it upon its sentencing.

I do believe, however, that even without the
agreement to those particular facts, I think there is
enough evidence that the Court can make a finding that
the sentence that is being recommended by the parties is
appropriate. And just to let you know, Your Honor, I do
have one witness that I would like to present. It's

1  specific to the designation of placement at a Bureau of

2  Prisons facility, but that's the only witness I have.

3       THE COURT:  Okay.

4       MS. SISON:  So that's our position, sir.

5       THE COURT:  Ms. Sison, let me follow up on one

6  point, though, with regard to the acceptance by the Court

7  of the government's sentencing memorandum and the

8  exhibits there to -- in lieu of hearing any evidence.  Is

9  there any argument that you would be making with regard

10  to the credibility of that evidence that should

11  necessitate my hearing from those witnesses in person as

12  opposed to receiving this evidence in written form as I

13  have which I have already read?

14       MS. SISON:  I don't believe so, Your Honor.  I

15  think you have the information in those written documents

16  rather than hearing it from witnesses that will take the

17  stand.

18       THE COURT:  Okay.  Thank you.  In light of that,

19  Mr.  Savage, I really don't see the need to receive the

20  evidence from live witnesses as opposed to what I have

21  already read.  The sentencing memorandum that was

22  submitted was very extensive.  I have read it carefully

23  and, in light of the position taken on behalf of the

24  defendant, I will receive that evidence in the form that

25  it is presented and will be able to make sufficient

findings from that.  Therefore, if I understand
correctly, when we get to the evidentiary portion, there
will only be the one witness, that being a defense
witness that we'll need to call.  Do I understand that
correctly?

MR.  SAVAGE:  That's correct, Your Honor.  Just as
our record -- or, at the appropriate time I would move
into evidence what I've previously marked as Government's
Exhibits 1 through 17.  And then I have two additional
exhibits, Your Honor, that weren't in the memorandum that
I would proffer to the Court, which are Exhibits 18 and
19, at the appropriate time.

THE COURT:  Okay.  We'll get to that in a moment.
But, first, with regard to some of the preliminary
matters.  Regarding the Rule 11 and the taking of the
plea.  The Court took the guilty plea of Mr.  Sullivan
back in November and, at that time, the Court made
specific findings which I now reiterate.  That being,
based upon the representations made to the Court and the
answers given by the defendant at the Rule 11 hearing,
the Court finds, concludes and confirms that the
defendant's plea is knowingly and voluntarily made, and
that the defendant understands the charges, potential
penalties and consequences of his plea and, also, based
on the uncontroverted and admitted evidence that has been

1  set forth in the factual basis document and to the extent
2  that that has also been incorporated into the presentence
3  report.  And, both, that factual basis document, the
4  undisputed portions thereof, and the presentence report
5  have previously been reviewed by the Court.  And, based
6  thereon, and based upon the defendant's admission of
7  guilt, the Court finds, concludes and confirms that there
8  is a factual basis for the defendant's plea.

9       With that, Mr. Sullivan, I need for you to stand
10  for a moment, please.  Mr. Sullivan, there is a document
11  that has been prepared by the probation officer.  The
12  document that I'm talking about, on its front page, has a
13  caption on the upper left-hand side that says, "United
14  States of America versus Justin Nojan Sullivan, aka 'the
15  Mujahid,'" and on the upper right-hand side of the front
16  page it has a title that reads: " Presentence
17  Investigation Report."  Have you seen this document
18  before today?

19       THE DEFENDANT:  Yes.

20       THE COURT:  Have you had an opportunity to review
21  it with your attorney?

22       THE DEFENDANT:  Yes.

23       THE COURT:  Do you understand the contents of that
24  document?

25       THE DEFENDANT:  Yes.

1     THE COURT: Ms. Sison, have you had an opportunity

2  to review the presentence report with Mr. Sullivan?

3     MS. SISON: I have, sir.

4     THE COURT: Are you satisfied that he understands

5  the contents of the presentence report?

6     MS. SISON: I am, Your Honor.

7     THE COURT: Thank you, Mr. Sullivan. You may

8  take your seat.

9     Regarding the presentence report. There were

10  objections to the report that were filed on behalf of

11  both sides but they all appear to have been resolved.

12  Are there any issues regarding the presentence report

13  that we need to take up at this time? Any for the

14  defendant?

15     MS. SISON: None for Mr. Sullivan.

16     THE COURT: Any for the government?

17     MR. SAVAGE: No, Your Honor. They've all been

18  resolved.

19     THE COURT: With that, the Court will accept the

20  presentence report as written and as amended after the

21  resolution of those objections. Based thereon, the Court

22  will find that the total offense level that applies in

23  this case is 42, and the criminal history category that

24  applies in this case is category VI. Based on that total

25  offense level and criminal history category, the Court

will conclude as a matter of law that the guideline range

that applies in this case calls for a term of

incarceration between 360 and a term of life

imprisonment.

Ms. Sison, did calculate that correctly?

MS. SISON:  Yes, sir.

THE COURT:  Do you agree, Mr. Savage?

MR. SAVAGE:  Yes, Your Honor.

THE COURT:  Mr. Savage, you mentioned that there

were some exhibits that you wanted to tender as evidence.

MR. SAVAGE:  Yes, Your Honor, for the sake of

completeness for or record.  I know the Court's aware of

these but the government would now offer into evidence

what it has previously marked as attachments to its

sentencing memorandum as Government's Exhibits 1 through

17.  We would offer those into evidence in this hearing

today.

However, we would ask that with respect to those

exhibits that Exhibit 5, which portrays the grave of the

decedent, Mr. John Bailey Clark, that that remain under

seal because of its sensitive contents and that, also,

the transcripts and video of the defendant's statement,

which are Exhibits 12 and 13, remain under seal.  The

reason for that, Your Honor -- as the Court is aware,

there is a subsequent state proceeding.  I believe it

1  would prejudice the ability of the state to find a jury

2  if the statements of the defendant were verbatim placed

3  in the press at this time.

4      Your Honor, we would also offer -- and I think the

5  Court has a copy of the notebook that we prepared with

6  all the exhibits in it.  We would also offer into

7  evidence what we have previously marked as Government's

8  Exhibit 18.  I'll show that to the defense counsel.

9  That's a document that we previously provided in

10  discovery.  It is the written statement of Special Agent

11  Power of the SBI, State Bureau of Investigation, that

12  describes his search of the crime scene at Mr.  Clark's

13  residence in Morganton.  Specifically, the crime scene

14  search of 557 Rose Carswell Road, Morganton, North

15  Carolina.

16      Your Honor, Exhibit No. 19 is the curriculum vitae

17  of John Webb.  Mr. Webb is a forensic examiner at the

18  FBI's laboratory in Quantico.  Mr. Webb performed an

19  analysis of the Marlin -- .222 Marlin shotgun that was

20  found underneath the defendant's house hidden in a crawl

21  space and compared that with the cartridge that was found

22  in Mr.  Clark's bedroom, which was the scene of the

23  murder.  He is the author of the report that the

24  government is offering at Government's Exhibit 11.  We

25  offer that exhibit merely to show that Mr. Webb, who is

present in the courtroom today, if he were to testify,

that he is qualified to make those assessments.

THE COURT:  Okay.  Ms. Sison, let me go through

these one at a time.  Is there any objection on the part

of the defendant to the admission of the Exhibits 1

through 17 which have previously been filed which the

government?

MS. SISON:  Your Honor, the only objection we

would pose is the same one that we posed before and that

he still maintains he has not made any admissions to the

Clark case.

THE COURT:  But as to the admission, you -- the

admission of the evidence.  I understand he's not

admitting that those elements are true but, as to the

admission of the evidence, there is no objection.  Is

that correct?

MS. SISON:  That's correct, Your Honor.

THE COURT:  And, then, with regard to Exhibit 5,

those photographs that were described by Mr. Savage.  Is

there any objection to at least temporarily maintaining

those under seal in the court's file?

MS. SISON:  No, Your Honor.  And we don't object

to their admission of that particular exhibit but just to

-- again, I'm reiterating his right under the Fifth

Amendment to maintain he makes no admissions as to the

1   Clark case.

2        THE COURT:  And I do understand that.  And then,

3   also, with regard to Exhibits 12 and 13, those two

4   transcripts.  Again, the government has asked that those

5   remain under seal, at least temporarily.  As you know, I

6   do not like the idea of keeping things under seal but

7   temporarily under seal pending the state matter.  Is

8   there any objection to those remaining sealed on a

9   temporary basis?

10        MS. SISON:  No, Your Honor.

11        THE COURT:  Now with regard to Government's

12   Exhibit 18, the SBI report.  Is there any objection to

13   the admission of that report?

14        MS. SISON:  As to the Court setting it for the

15   purposes of the determining a sentence, no.  But, again,

16   he maintains his Fifth Amendment rights, sir.

17        THE COURT:  And then with regard to Government's

18   Exhibit 19, the curriculum vitae of Mr. Webb.  Is there

19   any objection to the admission of that item?

20        MS. SISON:  That will be my same response to that

21   exhibit, Your Honor.

22        THE COURT:  Okay.  And with that, then,

23   Government's Exhibits 1 through 19 are admitted for the

24   purposes of this hearing.  Exhibits 5, 12 and 13 shall

25   remain under seal.  The others will not be sealed, but 5,

12 and 13 will remain under seal until further orders of
this court. And even though this isn't a self-executing
order but, after the conclusion -- it is my intent that
after the conclusion of the state court proceeding that
that seal would be lifted, because it is important for
the public to understand what goes on in this court and
the basis for this court's rulings and, therefore,
maintaining the sealing of such matters in perpetuity
would not be appropriate. But I am requiring those three
exhibits to remain under seal until further order of this
court.

        (Government's Exhibits 1, 2, 3, 4, 5 [Under

        Seal], 6, 7, 8, 9, 10, 11, 12 [Under Seal],

        13 [Under Seal], 14, 15, 16, 17, 18, and 19

        are admitted into evidence.)

    THE COURT: Mr. Savage, is there anything else
that the government seeks to admit?

    MR. SAVAGE: Not at this time, Your Honor.

    THE COURT: Okay. Ms. Sison, you said that there
would be evidence for the defendant.

    MS. SISON: Yes, Your Honor. I would like to call
Dr. James Hilkey.

    THE COURT: Okay. Dr. Hilkey, please come forward
to be sworn.

        (Witness duly sworn at 9:22 a.m.)

DIRECT - HILKEY

1        MS. SISON:  Your Honor, before I ask Dr. Hilkey

2   any questions, I would like to tender to the Court his

3   CV.  And I have provided copies of the CV to the

4   government.

5        THE COURT:  You may approach and hand that up.

6        MR. SAVAGE:  No objection, Your Honor.

7                    **DIRECT EXAMINATION**

8        BY MS. SISON:

9   Q.    Dr. Hilkey, can you spell your first and last name

10  for the record?

11  A.    Yes.  It's James H. Hilkey.  Last name is spelled

12  H I L K E Y.

13  Q.    What do you do a living, sir?

14  A.    I am a licensed psychologist practicing forensic

15  psychology.

16  Q.    Can you give an abbreviated list of your

17  qualifications?

18  A.    Yes, I can.  Born and raised in northern

19  California.  I was educated in Westmont College in Santa

20  Barbara, California, with a degree in psychology that was

21  conferred in 1968.  I have a master's degree in

22  counseling and clinical psychology conferred in 1970 from

23  Arizona State University, and I hold a Ph.D in counseling

24  and clinical psychology granted in 1975, conferred at

25  Indiana State University.

DIRECT - HILKEY

1  Q.     And have you -- you're in private practice now; is

2  that correct?

3  A.     I'm in private practice.  Prior to being in

4  private practice, I was a psychologist with the Federal

5  Bureau of Prisons.  I was the Chief of Psychology

6  Services at the Federal Correctional Institution from the

7  date of its opening until my retirement from federal

8  service in 1996.

9  Q.     And so how long was that, sir?

10 A.     Twenty-five years.

11 Q.     And what kind of duties did you have when you

12 worked at the Bureau of Prisons?

13 A.     I was responsible for 26 other psychologists and

14 mental health professionals.  I was the original clinical

15 director of the Mental Health Division which performed

16 psychological evaluations for federal courts.  We also

17 treated inmates in the federal system who had acute

18 psychiatric illnesses.  Butner had a joint commission

19 psychiatric hospital that was afforded treatment for

20 infirmed federal detainees.

21 Q.     As far as BOP's concerned, there are federal

22 medical facilities that have psychiatric units or

23 psychological units.

24 A.     That is correct.  At the time that Butner was

25 established, the only federal medical facility was in

DIRECT - HILKEY

1  Springfield, Missouri.  Butner was brought online to

2  provide psychiatric services and provide forensic

3  evaluations for federal courts with the increase of

4  population and demand increased.

5  Q.    Now there are other types of BOP facilities:

6  medium, camps, penitentiaries.  Do they have the same

7  type of medical care provided to the inmates?

8  A.    It varies, based on the security level.  Obviously

9  the medical centers are afforded greater psychiatric

10  mental health staff because of the demands of that

11  population.  All federal facilities have some semblance

12  of mental health services, but it does vary from

13  institution to institution and based on security levels.

14  Q.    And, so, if you had to rate which would provide

15  the most effective kind of psychiatric treatment, how

16  would you rate the types of facilities?

17  A.    Right.  The medical facilities are the most

18  equipped to handle acute psychiatric evaluations.  Most

19  of the forensic evaluations ordered by federal courts are

20  performed at medical centers.  Some of those studies are

21  completed at administrative FCIs, Federal Correctional

22  Institutions.  The designations are determined based on

23  the available staff, their qualifications to both treat

24  and evaluate federal presentence evaluations, and

25  sentenced prisoners.

DIRECT - HILKEY

1  Q.    Do you know what the designation people use to

2  determine what facility they are put in?

3  A.    Yes, I do.  When a person is sentenced, there is a

4  paper review in the central office by the designating

5  staff.  They look at factors such as age, prior criminal

6  offense records, severity of offense, and they make

7  determinations based on a paper review of the defendant

8  and sub designate that person.

9  Q.    All right.  Were you hired to work on the Justin

10 Sullivan case?

11 A.    Yes, I was.

12 Q.    Who hired you?

13 A.    The Western District of Public Defenders' office.

14 Q.    Okay.  And when was the first time you met with

15 Justin?

16 A.    I Initially met Justin at the Madison County

17 Detention Center on July 1st 1915 -- 2015.

18 Q.    And how many times would you estimate you've met

19 with him?

20 A.    I believe I have seen Mr.  Sullivan approximately

21 15 times, the last time being yesterday in the Buncombe

22 County Detention Center.

23 Q.    And what kind -- have you conducted any kind of

24 evaluation on him?

25 A.    Yes, I have.  I was asked to do the evaluation to

DIRECT - HILKEY

1  first develop a psychological profile of Mr. Sullivan

2  and to answer some specific questions posed by your

3  office. One: Is Mr. Sullivan actually competent to

4  proceed with the adjudication of this case, including his

5  competency to accept a plea? And, also, to establish his

6  mental state at the time of the alleged offense.

7  Q.     And were you able to make a decision as to whether

8  or not he is competent?

9  A.     It is my opinion that Mr. Sullivan is in fact

10  competent to proceed with adjudication with his current

11  charges and competent to enter a plea, which he has done.

12  Q.     All right. And how many types of tests did you

13  perform on Mr. Sullivan?

14  A.     I did a complete psychological battery with

15  Mr. Sullivan. That included tests for malingering to

16  see whether or not Mr. Sullivan was being truthful in

17  his presentation of his psychological symptoms. I also

18  gave tests of motivation, prior to administering

19  cognitive tests, to make sure he was putting forth good

20  effort. He was given an IQ test, he was given a variety

21  of both self-report personality tests and projective

22  techniques to assess personality traits of Mr. Sullivan.

23  Q.     And based on your time with Mr. Sullivan,

24  Dr. Hilkey, did you come up with any kind of diagnosis or

25  recommendation you could make to the Court as the best

DIRECT - HILKEY

1  place to put him?

2  A.    Yes, I did.  And the summary of those findings are

3  included in the presentence report.  I will not go into

4  all of those details.  Essentially, even though I believe

5  that Mr.  Sullivan's competent and I believe that he does

6  not meet the standards for insanity, as determined by

7  federal law, he does have very significant psychological

8  problems.  The predominant diagnosis is a prodromal form

9  of schizophrenia.  Prodromal schizophrenia is the

10  intermediate stage where people start showing some signs

11  of psychological deterioration.  It doesn't rise to the

12  full diagnosis of schizophrenia, but it warrants careful

13  observation because people at Mr.  Sullivan's age can

14  well deteriorate into an acute psychotic state.  That was

15  my concern and my assessment of Mr.  Sullivan at the time

16  of my evaluation.

17  Q.    And, so, when you say they have to be under

18  careful observation, what does that look like in terms of

19  the Bureau of Prisons?

20  A.    Mr.  Sullivan can show, under stress, some

21  deterioration.  He may in fact develop more acute

22  psychotic symptoms as he ages, with delusional ideation.

23  He may start showing both auditory and visual

24  hallucinations as part of the schizophrenic disorder.

25  Right now he is not showing acute signs, but his

DIRECT - HILKEY

1  psychological profile suggests considerable fragility,

2  and he could in fact deteriorate under acute stress.

3       Currently, he's doing well.  He's also currently

4  treated with antidepressant medications which has really

5  helped him adjust to the prison environment.  He's done

6  quite well in the confines of the Buncombe County jail.

7  His socialization abilities have improved, and the

8  structure afforded by that confinement has been helpful

9  to Mr.  Sullivan.  And he is in better shape now than he

10 was when I first saw him.

11 Q.    So someone like Mr.  Sullivan can be in a general

12 population?

13 A.    He has done well in general population at Buncombe

14 County.  Again, in sentencing, I think it's important to

15 find an environment that provides the adequate structure

16 and support but not in situations where more are more

17 restrictive than is needed.  So what my recommendation

18 would with be is that he be placed in a facility where he

19 could have continuous mental health observation in a

20 medium type of secure facility.

21 Q.    Okay.  So you're familiar with Super Max and ADX?

22 A.    I am.

23 Q.    Would that be a proper placement for him?

24 A.    In my opinion, Mr.  Sullivan does not require that

25 type of structure.  It is a very restrictive environment,

DIRECT - HILKEY

1  which is really reserved for those offenders who pose a

2  significant potential for acting out or are violent and

3  demand extra security.  In my opinion, Mr.  Sullivan does

4  not need that type of security.  In fact, it would be

5  deleterious to his long-term mental health adjustment.

6  Q.    Do you personally know if he's had any problems at

7  Buncombe County?

8  A.    He has not.  He has adjusted well.  There's not

9  been any significant incidences at all.  He's actually

10  socialized quite well.  And he's quite proud of the fact

11  that he's been able to relate to people much better than

12  he did when he was in the community.

13  Q.    All right.  The next classification level down

14  would be a United States Penitentiary.  What's your

15  opinion of placement at some place like that?

16  A.    I spent five years working at a maximum security

17  penitentiary in Indiana, and my experience would be that

18  that would be a very deleterious environment for

19  Mr.  Sullivan based on his age, his psychological

20  vulnerability, and his complex mental health problems.  I

21  would certainly advise against that type of placement.

22  Q.    And, so, what about a medium, or an FCI?

23  A.    Medium Security Federal Correctional Institution

24  would be an ideal place.  Those facilities are absolutely

25  secure but they afford the available mental health

DIRECT - HILKEY

1  services that Mr. Sullivan would require. It would

2  allow him to function well in a safe environment both for

3  himself and for others.

4  Q.    But the optimum would be a medical center?

5  A.    The optimal would be -- initially, I would

6  recommend that he be evaluated to have the Bureau of

7  Prisons have additional information about Mr. Sullivan.

8  He presents with a very complex psychological picture.

9  In my opinion a paper review would not do justice for

10 fully understanding his particular needs, and I would

11 recommend that he be evaluated at a medical center to

12 determine appropriate placement, if the Court so orders.

13 Q.    As I understand what you just said, Dr. Hilkey, is

14 that a paper review of his case is not enough to find

15 proper designation. Is that correct?

16 A.    That would be my impression. Before this hearing

17 today I did consult with a colleague, Dr. Sally Johnson,

18 who I worked with for many years. The Court may be

19 familiar with Dr. Johnson's work. Dr. Johnson used to be

20 the Chief of Psychiatry at the Federal Medical Center and

21 also for the Federal Bureau of Prisons. And I did

22 discuss this without mentioning Mr. Sullivan's name with

23 Dr. Johnson. And it was her recommendation that we ask

24 the Court for a pre-designation review. And I am not

25 sure of the particular statute in which that can be

DIRECT - HILKEY

1  ordered, but that would be my recommendation, I think,
2  with concurrence of Dr. Johnson as well.
3  Q.      So, as I understand it -- I mean he still goes to
4  a Bureau of Prisons facility, but the recommendation is
5  that he be observed in some sort of mental health setting
6  so that they can say this is the appropriate place, and
7  that's where you could send him off to.  So it's not only
8  paper but it's also actual observations?
9  A.      Absolutely.  In those types of studies we used to
10  do those under the provision of 4245(b) studies, I
11  believe is the correct term.  But it gave the staff a
12  chance to observe the behavior and get to know
13  Mr.  Sullivan and to make any adjustments in his current
14  medications and then use that information for an
15  appropriate designation for his incarceration.
16  Q.      So you said it's been done before.  It's not as if
17  we're asking the Court to do something that's never been
18  done before?
19  A.      No, that is correct.
20  Q.      Okay.  And so that particular recommendation would
21  have to be in the court's recommendation to BOP, I take
22  it?
23  A.      I believe that would be helpful to the designation
24  authorities within the federal Bureau of Prisons to have
25  that recommendation from this court.

CROSS - HILKEY

1  Q.     Is there anything else that the Court needs to

2  know about Mr.  Sullivan?

3  A.     Not that I know of.  Again, I think the summary of

4  my findings are detailed in the report that the judge has

5  had a chance to read.  It's contained in the presentence

6  report.

7  Q.     All right.  Thank you, Dr. Hilkey.  I have no more

8  questions, sir.

9       THE COURT:  Mr.  Savage, any cross-examination?

10       MR.  SAVAGE:  Thank you.

11                    **CROSS-EXAMINATION**

12       BY MR. SAVAGE:

13  Q.     Good morning, Dr. Hilkey.

14  A.     Good morning, Mr.  Savage.

15  Q.     You said that the defendant may possibly or could

16  develop a psychosis such as schizophrenia?

17  A.     There's no way of guaranteeing or assuring that

18  that could happen.  He certainly has risk factors which

19  indicate that that is a possibility.  And I think it's

20  prudent to be aware of those situations and afford the

21  opportunity for further evaluation, in the event that

22  there is a deterioration and be adequately treated.

23  Q.     Is the defendant currently taking any medication?

24  A.     He is.

25  Q.     If he takes that medication does his condition and

CROSS - HILKEY

1  his risk of developing this psychosis improve?

2  A.    Again, the medication he's currently taking is an

3  antidepressant medication.    There is some indication that

4  SSRI is the type of medication -- seritonin reuptake

5  inhibitors -- may not be the appropriate medication.    I

6  think it would be prudent to have a complete psychiatric

7  exam in a controlled environment to further evaluate the

8  adequacy of his current medication.

9  Q.    Well you've seen him 15 times?

10  A.    I have.

11  Q.    So you've had an extensive period of time to

12  evaluate him; is that correct?

13  A.    I have.

14  Q.    You've provided your report and it is actually in

15  the presentence report?

16  A.    That is correct.

17  Q.    And, in addition, the defense in the state case

18  has -- are you familiar with -- let's see.    This would be

19  -- are you familiar with Dr. Corvin?

20  A.    I know Dr. Corvin, yes.

21  Q.    Did you consult with Dr. Corvin in his evaluation?

22  A.    Our evaluations -- my evaluation of Mr. Sullivan

23  was done independently.    I have reviewed Dr. Corvin's

24  memo so I am aware of his opinion.

25  Q.    Okay.    Now you mentioned that the Bureau of

CROSS - HILKEY

1  Prisons has observation and mental health treatment at

2  all of its facilities.  Is that correct?

3  A.     It varies, obviously, with the -- because there

4  are a variety of needs that the federal Bureau of Prisons

5  serves, the institutions are staffed accordingly based on

6  the needs of the particular population they serve.

7  Q.     Certainly, the security of the prisoners -- of the

8  prisoner himself and his fellow prisoners is equally

9  important as this mental treatment?

10  A.     And the Bureau of Prisons will certainly take that

11  into consideration.  Medium security facilities are quite

12  secure.  I spent 20 years at Butner and we had many very

13  high profile inmates there, many of which are known to

14  the population.  That was a very secure facility but it

15  did afford both medical care and adequate security.  So

16  the concerns that I have, I think, Mr.  Savage about

17  placing a person like Mr.  Sullivan in a high security

18  ADX or maximum security federal penitentiary is that he's

19  going to be surrounded by people who are much more

20  sophisticated criminally.  He is a young person and he's

21  quite vulnerable.  I think that the proper punishment,

22  confinement, can certainly be done in a less restrictive

23  environment which will be more beneficial for

24  Mr.  Sullivan while providing safety for the community

25  and his fellow inmates.

CROSS - HILKEY

1  Q.    You mean at a high security prison he could be

2  surrounded by cold-blooded murderers?

3  A.    Well I think I know where you're going with that

4  question.  But he -

5  Q.    Well, no, it's just a question.

6  A.    There are people who are in high security who are

7  much more criminally sophisticated than Mr.  Sullivan.

8  Q.    Okay.  Well let's talk about that.  Did you talk

9  with Mr.  Sullivan about whether he has acted out any of

10  his violent thoughts in the past?

11  A.    I have no direct opinion about that.

12  Q.    Well did you talk to him about that?

13  A.    I think this -- I need advice from the Court on

14  this now.  I think this goes into the Mr.  Clark issue

15  and I'm not prepared to discuss that at this time.

16      MR. SAVAGE:  Well, Your Honor, I think that the

17  doctor has testified regarding his recommendation, and I

18  think that the security issue of whether the defendant

19  has committed a murder in the past is certainly relevant

20  to this discussion.

21      THE COURT:  You've been asked a specific question.

22  Listen to the question.  Answer what has been asked but

23  only what has been asked.

24      THE WITNESS:  Would you restate the question,

25  Mr.  Savage?

CROSS - HILKEY

1    BY MR. SAVAGE:

2  Q.    Did you talk to the defendant about whether or not

3  he has acted out his violent ideations in the past?

4  A.    I did not discuss the Mr. Clark incident with

5  Mr. Sullivan.

6  Q.    But you're aware the defendant is accused?

7  A.    I am aware that he is accused.

8  Q.    Are you aware of the evidence that supports that

9  accusation?

10  A.    I am aware of some of that evidence. I did not

11  discuss the specifics -- that was not the request of my

12  evaluation of Mr. Sullivan.

13  Q.    Well certainly the sophistication of your patient

14  would depend upon whether or not he was sophisticated

15  enough to carry out a murder under the cover of darkness

16  and not be caught and then later lie about it. That

17  would indicate sophistication, would it not?

18  A.    Again, we're talking about criminal

19  sophistication, prior records, a course of a criminal

20  history of which Mr. Sullivan does not fit.

21  Q.    Okay.

22  A.    I know he's been accused of a serious offense in

23  addition to the federal offense. I'm aware of that. He

24  does not have a record of prior violence and he is not

25  criminally or psychologically sophisticated.

CROSS - HILKEY

1  Q.     Okay.

2  A.     I believe -- again, my opinion is that he can be

3  adequately cared for in a safe environment, both for the

4  community and himself, in a less secure facility.

5  Q.     Well if the defendant were convicted and in fact

6  this court finds, as it may, that the defendant committed

7  a calculated and cold-blooded murder, that would

8  certainly be part of the evaluation of the Bureau of

9  Prisons would have to make, wouldn't it?

10  A.     And I think that would be the purview of our

11  recommendation for a pre-designation evaluation to

12  determine the potential for acting out.

13  Q.     Now, in addition, are you aware of evidence in the

14  defendant's -- in this case that the defendant sought out

15  ISIS and terrorist organizations because of his -- he

16  agreed with their ideations and their fixation on death?

17  A.     I am aware of that.

18  Q.     And are there computers at the facilities which

19  are low security?  I mean is he able to access the

20  Internet?

21  A.     Mr.  Savage, we're not talking about a low

22  security.  We're talking about a medium security.  And I

23  can assure you that the Federal Bureau of Prisons makes

24  every provision to maintain that people do not have

25  access in ways of furthering their criminal activities.

CROSS - HILKEY

1  Q.    In your discussions with the defendant, has he

2  expressed any remorse for his plan to carry out a mass

3  attack and killing as many people as he possibly could?

4  A.    He is ardent in his belief about his Muslim faith.

5  He has not expressed any specific intent to carry out

6  that in the future.  There's no way of predicting that

7  but, again, the risk of him doing that in a secure

8  facility is quite remote.

9  Q.    Well, again, the question was, did he express any

10 remorse for his plan to carry out the mass attack in

11 support of the Islamic State?

12 A.    He did not specifically state remorse to me.  He

13 is ardent in his faith and that is important to him.

14 Q.    No further questions, Your Honor.

15       THE COURT:  Any redirect, Ms. Sison?

16       MS. SISON:  Yes, sir.

17                **REDIRECT EXAMINATION**

18       BY MS. SISON:

19 Q.    Dr. Hilkey, getting back to him being surrounded

20 by other people with longer criminal histories who are

21 very versed in the criminal life.  What is your concern

22 about Mr. Sullivan being with people like that?

23 A.    Mr. Sullivan, even though he's chronologically in

24 his early 20s, developmentally and psychologically he's

25 much younger.  He's very susceptible to the influence

REDIRECT - HILKEY

1  of others.  I think putting him in an environment where

2  he's exposed to more sophisticated individuals may, in

3  fact, enhance his risk to act out, and I think that he

4  would be much better served in a less secured facility.

5  Again, our recommendation is that we afford a

6  pre-predetermination to assess some of these issues and

7  use that information in an appropriate designation.

8  Q.     And is your concern about some of these higher

9  facilities due to the fact that he can also be physically

10 hurt by the people there?

11 A.     Again, his age makes him quite vulnerable to his

12 own physical safety in a higher secure facility.

13 Q.     Okay.  Given the questions that the government has

14 asked, do you still believe that he is better served in a

15 facility that isn't as highly designated as ADX or the

16 USP?

17 A.     That is my ardent belief and opinion, yes.

18 Q.     And you had also -- he had also asked you a

19 question about antidepressants.  Do you know if the jail

20 -- Buncombe County, specifically -- can provide any kind

21 of intensive psychological treatment to the people that

22 are there waiting their witnesses?

23 A.     They, like most county jails, are not equipped to

24 provide other than just rudimentary services.  There is

25 no ongoing counseling, no ongoing mental health services,

REDIRECT - HILKEY

1   other than medication management.

2   Q.     Okay.  And even during the time that he's been in

3   custody for the past -- over a year, you've never heard

4   of him ever hurting another person.

5   A.     That is correct.

6   Q.     Or continuing work in ISIS?

7   A.     That is correct.  And, again, his behavior has

8   been quite contained.  He's been continuously respectful

9   to me.  I've had a chance to observe him with other staff

10  during multiple visits.  He's always been polite and

11  respectful.  There's been no incidents of acting out.

12  There's not been -- he's not been placed in intensive

13  confinement at the Buncombe County jail.

14  Q.     Okay.  Thank you, sir.

15         No more questions, Your Honor.

16         THE COURT:  Anything else Mr. Savage?

17         MR. SAVAGE:  No, Your Honor.

18         THE COURT:  Thank you, Dr. Hilkey.  You may step

19  down.

20         THE WITNESS:  Thank you, Your Honor.

21                (Witness excused at 9:48 a.m.)

22         THE COURT:  Is there anything else in the way of

23  evidence to be presented by the defense?

24         MS. SISON:  No, Your Honor.  Thank you.

25         MR. SAVAGE:  Not from the government, Your Honor.

1      THE COURT:  Is there anything else we need to

2  address before we move on to the question of the

3  arguments of whether the Court should accept the sentence

4  that was proposed in the 11(c)(1)(C) plea agreement?

5  Anything else we need to address first?

6      MR. SAVAGE:  Your Honor, I think that the

7  government would ask that the Court make findings on the

8  disputed facts and then, based on those findings, I think

9  the argument can be more focused.  Specifically, I think

10  the government in its sentencing memorandum --

11      THE COURT:  Let me stop you, Mr.  Savage, because

12  I had in mind the idea that you could make your arguments

13  with regard to facts with regard to the acceptance of the

14  sentence.  It would be very hard, I would think, to

15  separate those arguments.  So I envision you making those

16  arguments together and then I will proceed with that

17  afterward.

18      MR.  SAVAGE:  Yes, Your Honor.  I'm happy to do

19  so.

20      THE COURT:  Ms. Sison, let me hear from you then.

21  I want you to address not only what I should find as fact

22  but also your reasons for why you believe I should accept

23  what has been agreed upon in the 11(c)(1)(C) agreement as

24  to the appropriate sentence in this case.

25      MS. SISON:  Your Honor, the guidelines here are

1　360 to life.  So the Court isn't being asked to vary

2　upward in order to get the sentence both parries are

3　requesting.  And, so, you are getting -- you are given a

4　guidelines sentence, whether you choose to be on the low

5　end or on the high end.  So there's no issue as to that

6　the Court needs to find anything more.

7　　　　I believe that just based on the information

8　regarding the specifics of the offenses that Mr.

9　Sullivan has pleaded guilty to that the life sentence

10　that we are asking this court to impose in this case is

11　adequate; just those findings without any references to

12　the Clark case.  And I say that because this court has

13　been given all the information it needs regarding his

14　behavior during the time that the FBI was dealing with

15　him in that operation, the request that he's made of the

16　FBI, the things that he did regarding the conversations

17　that he had with this undercover agent.

18　　　　I don't think you need to go further in order to

19　look into the Clark matter in order to make those

20　findings that this is an appropriate sentence that we are

21　recommending to the Court.  And, again, part of my

22　concern is that there is a pending state matter.  You've

23　got an agreement between the parties that there is enough

24　evidence here to give a life sentence to Mr.  Sullivan.

25　　　　So when I look at what the Court has to do as far

1  as determining whether or not a life sentence is

2  appropriate, obviously, it takes into consideration the

3  seriousness of this offense.  And, Your Honor, given

4  what's been happening in the world in the past 15 years,

5  I can't think of anything more serious than terrorist

6  acts, or attempts to commit terrorist acts, and I think

7  that's something that across borders people will agree

8  that that is a very, very serious offense, and that's

9  what we have in court today.

10      As far as a life sentence.  It does promote

11  respect for the law because it says to the people outside

12  of this court who believes that these things are very,

13  very serious.  It protects the public by keeping

14  Mr. Sullivan in custody for the rest of his life.  And,

15  as far as deterrence, there is both specific and general

16  deterrence.  And, so, I think that the evidence before

17  you -- Mr. Clark's pending case notwithstanding -- is

18  adequate to meet the purposes of sentencing.

19      So, really, Your Honor, the argument that I want

20  to make and I want to focus on now is that we have agreed

21  upon the appropriateness of a life sentence is this.  The

22  Court has to look at 3553(a) factors, and I think I've

23  touched upon them in this elocution.  But the one factor

24  that I'm asking this court to look deeply into and I

25  think is the most important part for Mr. Sullivan is

3553(a)(1)(D).  Specifically, that talks about the type of sentence that this court must fashion is to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  So that stands alone and, obviously, it's important enough that it is part of 3553(a) factors.

Specifically, the portion of that particular subsection is the medical care which in this case is mental healthcare.  Part of the reason we've worked so much on trying to figure out what is happening with Justin is to find out at some point what happened to him and what can we do for him in the future.  And when I look at that particular subsection, Your Honor, it says that the Bureau of Prisons must provide him with needed medical care.  And we have shown the Court that it is needed.  I mean you can't just put this man away and not give him any type of mental health treatment.  That would be cruel.

Also, Your Honor, when they say "much needed care."  We're not talking about an occasional visit to a counselor.  Maybe he can go once a month or once every couple months.  That is not the care that we are looking for.  We're looking for care in which, as you heard from Dr. Hilkey, there's a chance that this may go into full

1  schizophrenia, and that's something that they have to

2  watch out for.  And you can't watch out for that unless

3  you have a unit that's equipped to handle that kind of

4  thing.  Part of that statute also requires that the

5  treatment must be provided in the most effective manner.

6  That is part of that subsection.  And when you say "most

7  effective manner," that means we're not paying lip

8  service to it.  We're saying that you have to figure out

9  where is the best place for this person.

10      And the Bureau of Prisons does listen to the

11  Court, Your Honor.  That's why we submitted Dr. Hilkey's

12  letter and asked probation to make it part of the

13  presentence report, because we wanted them to look at

14  that.  Obviously, we're asking a little bit more.  That's

15  the whole purpose of Dr. Hilkey testifying is that we are

16  concerned that they're just going to do a paper

17  designation which we don't feel is enough.  Yes, it's

18  comprehensive what Dr. Hilkey said.

19      But, I think, in order to provide the best place

20  so that he can get the needed medical care in the most

21  effective manner they have to do a little bit more.  And

22  so what we're asking this court to do is to recommend to

23  the Bureau of Prisons that they do a study to determine

24  what place is that?  It doesn't mean that Justin gets to

25  go out.  I mean he goes straight to the facility but that

1  particular facility has the manpower, i.e., the

2  psychological team that can watch him, make observations,

3  make recommendations, determine what kind of medication

4  he needs, and what placement he should be.  So that is

5  what we mean by the type of effective care.

6         Now Dr. Hilkey talked about how vulnerable Justin

7  is.  Obviously, he's vulnerable because of his age.  I

8  mean the offense occurred around the time he turned 18.

9  And we know all these studies that discuss the adolescent

10 brain and the young adult brain.  And, in fact, most

11 people will tell you that young people are not equipped

12 to make any kind of decisions, big decision, because

13 their brains haven't fully formed until about their mid-

14 20s, and we recognize that as a society.

15        I mean he had just turned 18 at the time -- near

16 the time of his arrest.  And at 18, what do we allow

17 people to do?  Well we allow them to go to war.  We allow

18 them to vote.  We allow them to make contracts that they

19 can hold on their own.  But even at 18, young adults are

20 not allowed to do certain things.  And, in fact, just 17

21 days ago he is now about to legally drink.  And that's at

22 age 21.  That's three years after we consider somebody an

23 adult.  Now he can buy tobacco.  That's just a

24 recognition of our society that says these are still

25 kids.  Their brains are still forming.  They're

1   vulnerable.  And part of the reason we made such a big

2   thing about him not being put in ADX, Super Max, a USP or

3   any of the higher facilities is because when you're that

4   vulnerable, people can do things to you.  You are not

5   equipped to make the type of decisions that will take

6   these people away from you.  He can be used.  He can be

7   manipulated.  And, so, that's the reason we say that is

8   not an appropriate place for him.

9        Now, Your Honor, I know that part of the colloquy

10  that the Court says to our clients whenever we ask the

11  court to make a recommendation is this:  I don't know

12  what the Bureau of Prisons will do.  It's just the

13  recommendation.  I can't force them to do something.  But

14  know, Your Honor, that what comes from the Court is

15  really, really important to the Bureau of Prisons.  I

16  think they make an effort to do what the Court believes

17  is right.  And why is that?  It's because the Court has

18  taken the time to study this case.  It's taken time to

19  study the pleadings.  It's taken time to look at the

20  client.  It's taken time to talk to the prosecutor and

21  defense and listen to the arguments that are being made.

22  It's taken time to appoint a probation officer to do a

23  really thorough presentence report in which in this case

24  that was done.  Obviously, you are doing more work than

25  somebody who's just looking at paper at the designation.

1  Yes, they may be good at it but you have done more in
2  determining what kind of sentence.

3  Now I heard a story from the Bureau of Prisons
4  legal counsel in which 19. He turned 19, Your Honor. He
5  just wanted me to correct that.

6  But I want to tell the story the legal counsel
7  told me about a judge who was frustrated with the Bureau
8  of Prisons and said you never take my recommendations.
9  Every time I make a recommendation, you send me a letter
10  that says I'm sorry we weren't able to designate these
11  people at this particular place. Well they contacted
12  that judge, Your Honor, and they said, look. We actually
13  do take your recommendations. And in fact we figure out
14  it's about 83 percent of the time. But the reason it
15  seems like a lot to you is because we send you a letter
16  when we can't do it but we don't send you a letter when
17  we do do it.

18  So if you look at the time you've made the
19  recommendations, you're not counting those times Your
20  Honor. And this person -- this is a BOP legal counsel
21  who said they take what you say very seriously. And, so,
22  that's the reason I say to Your Honor I understand that
23  it's just a recommendation, but it is a strong
24  recommendation and it's based on the evidence that is
25  before you.

1    Obviously this isn't a typical case and you don't

2 get this case every day.  In fact, the interest in this

3 case is tremendous.  I see that by looking behind me, and

4 I see that looking at the trucks that are outside.  What

5 is going to happen to this young man?  And all I'm asking

6 this court to do is to make that kind of recommendation

7 that will take care of this young man.  I mean he is

8 being punished.  And I know there are people who say, why

9 should he get that kind of treatment?  Why should he get

10 this in the Bureau of Prisons?  I can't get this outside.

11 And maybe they're right.  But to say that he isn't being

12 punished and you're looking at a life sentence, I think

13 that conversation should be a nonstopper.  He is going to

14 prison for the rest of his life.  And I think, we as a

15 society, have an obligation to make sure that he is safe

16 and, also, he gets the treatment that he needs.

17        Now, Your Honor, obviously this case means a lot

18 to the defense.  Yesterday I thought about how we, as a

19 society, look at people that we put in prison and, you

20 know, Gandhi said that the true measure of any society

21 can be found in how it treats its most vulnerable

22 members.  Obviously we can all be vulnerable because we

23 don't know what can happen to us day-to-day.  We walk

24 down the street and we may be hit by a car.  We may get a

25 cancer diagnosis.  We don't know.  But all of us are to

some extent vulnerable.  When you put people in custody,
you put them in a locked place where they can't get out.
If there is something that puts me in danger, I have
other options.  I can hire somebody to protect me.  I can
prove move away some place else.  There are other options
for me.  When you put somebody in prison, especially
someone as young as Justin is, he does have those
vulnerabilities but he can't have a way out.  So that's
the reason we're asking this court to consider what is
the best place for him.

Now I was listening to the radio yesterday --
actually on Sunday, Your Honor, and one of the things
that caught my attention in listening to this program is
Pope Francis had said something that, as a society, we
spend more time building museums for saints rather than
building hospitals for sinners.  And I think what he
meant by that is that we do spend a lot of time not
paying attention to the people that are least among all
of us.  I'm not saying that Justin is a perfect example
of a great human being.  I think he knows what he did in
dealing with the FBI agent, that's all bad, okay, and
that is a sin.  But at the same time I think what Pope
Francis was talking about is in creating hospitals for
sinners is that we must help them heal.  And the healing
process requires them being put in a hospital that's

1 right for him.

2     I mean I don't think any of us can say we're not

3 broken people. We all are broken people. Some of us are

4 more broken than others, and it is up to us as a society

5 to take care of those who are the most broken. And

6 sometimes we can help ourselves become less broken. And

7 I -- as an example, if I feel broken I can talk to

8 friends, I can work out, I can do all sorts of things to

9 make myself less broken. I can go to a psychiatrist. I

10 can do all those things because I'm on the outside and I

11 have that freedom. The people that are inside, they

12 can't do that. But you can.

13     All I'm asking this court to do is to make that

14 recommendation and in fact I am going to ask this court

15 to consider the following. I typed up something that I

16 hope this court will consider in its recommendation to

17 the Bureau of Prisons. And if I can read that to the

18 Court and submit it, I would appreciate it Your Honor.

19     THE COURT: You may approach and hand that up.

20     MS. SISON: Specifically, Your Honor -- and I hope

21 the Court considers in determining the recommendation to

22 the Bureau of Prisons is that, pursuant to 18, U.S.C.,

23 3553(a)(1)(D) which requires that a defendant be provided

24 with needed medical care in the most effective manner.

25 You, the Court, am recommending to the Bureau of Prisons

1    that Mr.  Sullivan undergo a pre-assignment study

2    consisting of a psychological/psychiatric evaluation to

3    properly determine the appropriate designation for

4    Mr.  Sullivan.  Because of Mr.  Sullivan's age, his

5    vulnerabilities, and his complicated mental health

6    profile, a pre-assignment study would ensure

7    Mr.  Sullivan receives the mental health services he

8    needs in the least restrictive environment as possible.

9         We are not questioning the life sentence, Your

10   Honor.  In fact, we are supporting it and ask that you

11   impose that.  However, we are asking this one particular

12   thing and I think the law supports our request for it,

13   and I hope that this court does exactly that.  Thank you,

14   sir.

15        THE COURT:  Thank you.

16        Mr.  Savage, what is the position of the

17   government?

18        MR.  SAVAGE:  Your Honor, just to begin with, the

19   Court -- the government would move at this time to remove

20   the seal on Document 66.  We had sealed that document in

21   accordance with the protocol of this district and because

22   it referred to the recommendation of the psychiatrist, or

23   psychologist, Dr. Hilkey who has now testified.  So we

24   think there is no reason to keep that under seal.  It

25   doesn't refer to anything -- any personal issues in the

1  presentence report, and then we would refer to that in

2  our argument.

3        THE COURT:  Are you asking for that to be unsealed

4  now so you can refer to it in part of your argument?  Or

5  are you just bringing this up as a housekeeping matter?

6        MR.  SAVAGE:  Both, Your Honor, yes.

7        THE COURT:  Ms. Sison, is there any objection to

8  the current unsealing of Document 66?  That is

9  Dr. Hilkey's report.

10        MS. SISON:  No, Your Honor.

11        THE COURT:  Okay.  The motion, then, will be

12  allowed, and the seal with regard to Document 66 will be

13  removed.  Mr.  Savage, you may refer to that report in

14  your argument.

15        MR.  SAVAGE:  Thank you, Your Honor.  And I'll

16  keep my remarks brief, because I know the Court -- I know

17  this Court, in particular, reads everything when it comes

18  to the sentencing.  And I'm not going to remind the Court

19  of all the 3553 factors except the defense in this case

20  is focused on one, just one.  There is also the history

21  and characteristics of the defendant, the need to reflect

22  the seriousness of the offense, to provide adequate

23  deterrence, and to protect the public.

24        The needs of the defendant are just one of the

25  factors this court must look at.  Indeed, as the Court is

aware, the Bureau of Prisons is going to look at the
presentence report and this court's finding to inform it
on how it is going to balance security and the needs of
the defendant and all of the needs of the federal Bureau
of Prisons.  Your Honor, we don't disagree with 90
percent of what the defense said in this case.

We concur on the life sentence.  But we think
there are a couple of things the Court needs to address
in its duty to determine the particular sentence.  And
that is to make a resolution of the disputed facts in
this case.  And the disputed facts include an important
matter, and that is whether the defendant committed a
murder in conjunction with the charged offense in this
case.  And maybe not as directly part of it but,
certainly, within six months before he was detected in
reaching out to ISIS and planning an Orlando-style attack
on a soft target of vulnerable people in a nightclub or a
bar, he snuck down the street and, the facts suggest, he
killed his neighbor, a very vulnerable person,
Mr. John Bailey Clark was a 74 year old-man who was
living on Social Security disability of $600 a month, was
a recluse, never hurt anybody, never did anything.  If
anybody was vulnerable in this society, it was this man.
All he is doing is living his life in a peaceful manner
at the end of a street near Justin Sullivan.

1      Now the evidence in this case suggests that the

2 Court can make this determination by a preponderance of

3 the evidence, as cited in the report, and it begins on

4 page seven of the report.  And I know the Court has read

5 these, but I'll just kind of pick through a few things.

6 Ms. Glenda Clark, who is the defendant's sister-in-law,

7 and who is married to the defendant's brother, Douglas

8 Mackey Clark, is present in the courtroom today.  She

9 went to Mr. Clark's house on the day.

10      THE COURT:  The defendant's?

11      MR. SAVAGE:  I'm sorry.  The victim's.  It's the

12 victim.  I misspoke, Your Honor.  I'm sorry.  I'm getting

13 ahead of myself.  I'll slow down a bit.

14      Mrs. Clark went to see her brother-in-law, John,

15 as it says in the report, on the day of the 17th.  He was

16 alive and well on December 17th.  The next day she went

17 to check, and bring groceries home, and noticed that the

18 light was out in the house, which was very unusual for

19 Mr. Clark, who doesn't go out at night and stays home

20 all the time.  He doesn't have anywhere else to go.

21      She went with her son-in-law and checked on the

22 house and immediately knew something was wrong.  There

23 was disturbed earth at the side of the house.  She goes

24 in, opens the door, and there are strained blood marks

25 all through the house, and the lights were off.  She

1    called 911, as Exhibit 1 shows, at 6:15.  The police came

2    and within -- the law enforcement came, and within a

3    matter of hours they unearthed the body of John Clark

4    buried in a shallow grave at the side of his house, with

5    no clothes on, who had been murdered in his bedroom and,

6    as the autopsy shows, with three bullets to his head

7    which were later determined by Mr. Webb, at the

8    laboratory in Quantico, to be from a .22 caliber rifle.

9        That rifle was found in the defendant's house,

10   along with a silencer, a black mask, and a lock pick kit,

11   buried under a plastic tarp, as shown in the exhibits

12   that accompanied the FBI's search which would be Exhibit

13   10.  And they found in the bedroom of Mr. Clark a shell

14   casing from a .22 caliber rifle.  That shell casing was

15   determined with specific conclusory evidence to match the

16   same as that test fired by Mr. Webb from that weapon at

17   the Quantico laboratory.  And that weapon was the key

18   part of the interview that James Meade -- agents Meade

19   and Zackman when they conducted the defendant's

20   interview.  And the entire interview is there at Exhibits

21   12 and 13 for the Court to review.

22       When they interviewed him on the 19th, on the day

23   he was arrested, the agents asked him:  Do you have a

24   rifle?  Do you have any weapons?  Obviously important

25   questions to somebody who's planning a terrorist attack.

1   And his answer was no.  They said, do you know anything

2   about Mr. Clark and what happened to him?  The defendant

3   acknowledged that he knew who he was.  And his answer was

4   not no, I didn't do anything; it's, I've never been on

5   his property.  The following day, after the search was

6   conducted -- and if the Court goes specifically to page

7   11 of that second interview -- the defendant was reminded

8   of the day before that he promised to tell the truth.

9        When the agents asked the defendant whether he

10  told the truth, what was his response?  He said, oh.  You

11  found the gun.  I didn't tell you about the gun.  I lied

12  about the gun.  And then at that point, knowing that they

13  had the gun, he stole it from his father, Richie

14  Sullivan, who kept it otherwise locked up.  You have the

15  reports of interview of Mr. Sullivan by the people who

16  canvassed the area around the neighbors on -- right after

17  December 2014.  And Mr. Sullivan tells the canvassing

18  sheriff:  My wife and I weren't home.

19       He doesn't say that anybody else lived in the

20  house.  He just simply says they weren't home.  But we

21  well know from the statements that Mr. Justin Sullivan

22  made later, six months later, that he was home, home

23  alone.  And, in fact, he tried to make the mass attacks

24  that he talked to Janaid Hussein about, a notorious ISIL

25  hacker in Syria.  He talked about the fact he was going

1    to do those attacks on the next day or the next Monday or

2    Tuesday because his parents would not be home.

3        So you put all these facts together on this time

4    line, and the only conclusion -- certainly, by a

5    preponderance of the evidence in this case -- is that the

6    defendant murdered Mr. Clark for whatever reason, just

7    because he could and just because he was vulnerable.  Now

8    that's a vulnerable person.  Who would think that a 74

9    year-old man sleeping in his bed would be assailed and

10   shot three times in the head and buried in his yard

11   because he lived next door to a person who was fixated by

12   death and who sought out ISIL?

13       Those facts -- Your Honor, we would suggest that

14   the Court should make a finding on that because it's

15   certainly relevant to the nature and characteristics of

16   this defendant.  It's also relevant to the very charge,

17   as the Court is aware, from the texts that were conducted

18   and are listed in detail in the factual resume which is

19   now the facts of this case.  The defendant told -- when

20   he is trying to recruit the undercover in this case who

21   is posing as a person who might be interested in ISIL,

22   but the defendant was trying to recruit him to commit his

23   own atrocities, the defendant -- he asked the undercover

24   to commit a murder on his own so that he can trust him so

25   he wouldn't know that he's, quote, "an informant," so he

wouldn't be arrested.  And what did the defendant say in
his text on Sure Spot?  He said, oh, don't worry.  You
won't get caught.  Just do it at night and wear a mask.
And when the Court looks at the evidence that Agent Guppy
found underneath -- buried underneath the defendant's
tarp underneath his house in the farthest part, where
nobody would find it, what did they find but a black ski
mask and the weapon used to murder Mr. Clark.  So, Your
Honor, if the BOP is truly going to make an informed
decision -- not just based on the defendant's need but on
the security of what the violent tendencies of what this
defendant are -- they need all the facts.

        Your Honor, one of the argument arguments the
defense makes in this case is the Court should not follow
its duty to make the determination because it could
impair what might be later on a decision by the state the
court.  But this well court is well aware of the
difference between the federal laws and the state court.
The state court would have to make a finding beyond a
reasonable doubt.  No court -- state court is going to
allow the determination of this court to be used in that
state court proceeding, and that proceeding would occur
upon its own merits, with its own rules, in its own time.
But that doesn't mean that this court shouldn't make a
finding that is relevant to its sentencing

1   responsibilities under 3553 or under the federal

2   sentencing guidelines.

3        Your Honor, for all the reasons that we cited in

4   the -- in our sentencing memorandum, which is now

5   unsealed, we suggest that this court should find that the

6   defendant caused the death of Mr. Clark by murdering him

7   with a weapon that he lied about and hid in his basement,

8   that that is relevant to the charged offenses of the

9   offense of conviction here, which is committing a -- or

10  planning and attempting to commit an atrocity, a

11  terrorist attack transcending national boundaries. And

12  even if it wasn't conduct, it certainly is conduct that

13  is informative of the defendant's characteristics.

14       With that in mind, when the Court considers the

15  fact the defendant committed a cold-blooded murder six

16  months before he planned another murder, a mass casualty,

17  solicited someone to kill his parents, solicited an

18  undercover to kill somebody just to demonstrate his good

19  faith, this shows that this defendant's history and

20  characteristics, particularly under 3553, is a very

21  dangerous man. He might be 20 years old, but there are

22  plenty of 20 year-olds who commit atrocities in this

23  society.

24       And the government suggests that the Court, as a

25  matter of justice, needs to provide justice to the

society in which this offender has committed these
offenses which reflects the nature around seriousness of
the offense.  Those offenses and offense of conviction
here becomes even more serious if you know the defendant
has committed murder before.  And the reason that informs
this Court is this.  If this person wasn't just sitting
in his basement talking to ISIS, he sought them out.

He said repeatedly in the answers to the question
which Agent Meade asked him:  Did they contact you or did
you contact them?  And his answer was:  I contacted them.
I found Janaid Hussein.  I looked on the Internet.  I saw
who he was.  I talked to other terrorists who were in
Syria.  I knew who they were.  I knew what they were
talking about, and I gave them ideas, ideas on how to
create mass casualty attacks that would create death and
mayhem in our society right here in North Carolina.

So the fact that the defendant had already
murdered somebody shows that he wasn't just thinking
about this.  It shows he was going to do it.  Other
things that showed he was going to do it is, while he was
under surveillance by the FBI, and while he was planning
this, he drove to a gun shop and tried to buy hollow
point bullets because, as he said in his text, hollow
point bullets will create maximum casualties, maximum
damage to the bodies of those people he would shoot.  He

1    did that.

2         He had the $600 ready to buy the gun, as he said.

3    He had the coupon because everybody wants to be thrifty

4    when they're going to the gun show to buy a weapon, an

5    AR-15.  He knew where he was going to buy it.  And he

6    knew he needed a silencer, I suggest, Your Honor, because

7    he had already shot Mr.  Clark in his house with a gun

8    and he knew what it was going to sound like.

9         So, for all those reasons, this defendant went out

10   of his way -- way beyond the mere musing of somebody.  It

11   is not a vulnerable youth in his basement who has been

12   tricked or cajoled by ISIS.  And I think that the other

13   defense psychiatrist in the state seems to think this was

14   a vulnerable youth who was preyed upon by ISIL

15   recruiters.  Not the case.  Not the case here, Your

16   Honor.  The facts in this case suggest, if anything, this

17   defendant was the person who was recruiting.  He tried to

18   recruit the undercover agent believing that he was a

19   person interested in committing murder just as he would.

20        So for all those reasons, Your Honor, under the

21   3553 factors, the life sentence is just not justified in

22   this case.  It's required.  It is the high end of the

23   guidelines.  But there is a guideline in this case

24   because the defendant is a cold-blooded murderer.  He has

25   committed a terrorist act.  He has a criminal history

1  category III because of the guidelines and experience of

2  the Sentencing Commission.

3  　　　　THE COURT:  Six.

4  　　　　MR. SAVAGE:  I'm sorry.  Six, Your Honor, because

5  the terrorism enhancement recognizes the danger that this

6  type of person imposes on society.

7  　　　　As for the defense recommendation about treatment

8  of the defendant.  Your Honor, I think that is best left

9  to the Bureau of Prisons not to consider just one aspect

10  of this, just one part of one facet of it, but to

11  consider all the factors.  This court's finding and the

12  presentence report will do that but, to do that, the

13  Court needs to make a finding regarding Mr.  Clark.

14  　　　　And we think it's important, both for the record

15  in this case, should it be reviewed on appeal, and

16  certainly for the presentence -- for the Bureau of

17  Prisons to have this court's finding based on all the

18  independent evidence that you have before you, and the

19  factual resume, that the defendant has committed murder,

20  would do so again, and this society needs to be

21  protected.  But more than that, that the seriousness of

22  the offense demands a serious punishment which, in this

23  case, is life imprisonment.  Thank you, Your Honor.

24  　　　　MS. SISON:  Your Honor I'd like to respond to some

25  of the things the government has said.  First, we've

already stipulated that a life sentence is appropriate

given the particular facts of the offense itself.  And I

don't believe that this court needs to make a finding as

to the Clark murder case.  Part of the reason I'm

concerned, Your Honor, is, one, you are using a different

burden of proof.  However, when it comes out that a court

made this particular finding then you tend to sway the

opinion of other people.  And so that's my biggest

concern.

As I said before, you've got a full proof plea

agreement in which we are not going to appeal a life

sentence.  And so you've got that.  And I'm telling you

right now we are not appealing his sentence because we

made the plea agreement with the government and we are

living up to it.  So I think there is enough proof in the

offense conduct itself to make that particular finding.

As to the unsealing of 66.  Let me -- on second

thought, Your Honor, here is my concern.  There's a

number of items in here that relate to the Clark case.

And I think that if this is unsealed and it is made

available to anybody then what happens is you take the

potential jury pool that is going to look at that case,

which is not what we want in this particular case.

To the extent we can redact it -- and I understand

what this court's saying and that you would like

everything to be out in the open.  However, sentencing

memorandums are typically not unsealed.  And they had

asked, and I had said all right.  But in retrospect,

given what the government has argued, I don't think it's

appropriate in this case.  And if the Court does decide

maybe it is appropriate, then I would ask this court to,

at this point, pretrial, on that particular case, that

you do not give it unless it's redacted as to any matters

that is in regard to that pending state matter.

THE COURT:  Which exhibit is the one that is the

report of Dr. Hilkey?

MS. SISON:  Your Honor, it's already in the

presentence report but it's also in our sentencing

position paper.  I think that might be 67.  I'm not

certain, Your Honor.

MR.  SAVAGE:  One minute, Your Honor.

MS. SISON:  That's 67, sir.

THE COURT:  So you're referring to where portions

of Dr. Hilkey's report was included within your letter,

Ms. Sison?

MS. SISON:  No, Your Honor.  I was talking about

the government's memorandum.  The government asked that

it be unsealed.

THE COURT:  Okay.  This is where you're confusing

me.  Because Mr. Savage asked for the unsealing of most

1   of Document 66, which is the government's sentencing

2   memorandum.  There were three specific exhibits that he

3   asked not to be unsealed but that the others to be

4   unsealed.  But if I -- maybe I just misunderstood you.  I

5   thought what you were saying is you felt that

6   Dr. Hilkey's report should not be unsealed, and I don't

7   believe that's part of Exhibit 66.

8         MS. SISON:  No, Your Honor.  I believe Mr. Savage

9   had indicated that the government's sentencing memorandum

10   should be unsealed and that's Document 66.  If I misheard

11   him, that's one thing.

12         THE COURT:  I don't mean to talk over you but I

13   want to make sure we have a clear record here.  When the

14   evidence was being presented, Mr. Savage had asked and

15   had offered into evidence the exhibits to Document 66,

16   which are the various elements of evidence that I'm being

17   asked to review.  From that, he excerpted three exhibits.

18   And if I remember correctly, it's Exhibits 5, 12 and 13

19   and that those not be unsealed but that the others be

20   unsealed.

21         MS. SISON:  Again, Your Honor, my concern is there

22   is a pending state case and, in retrospect, as I was

23   sitting here --

24         THE COURT:  I understand that.  I understand what

25   your argument is.  I just don't understand what you're

1   arguing for.  What is it that you don't want unsealed?

2       MS. SISON:  I don't want any references to the

3   pending state matter be unsealed and made available.  My

4   concern is that when they go to trial and you've got a

5   jury pool that's read all those materials which may or

6   may not be admissible in court.  And, so, if the Court is

7   inclined to put them out there and they're unsealed, then

8   at least take the time to redact any of the references to

9   that particular case.  Because I understand some of the

10  documents that are before the Court and they do -- they

11  have information about both the federal case and both

12  about the state case.  And, again, my concern is with the

13  state case and if they go to trial what will happen if

14  people have access to these documents that are not

15  redacted as to the state case.

16      THE COURT:  Well what I will do with regard to

17  Document 66 and all of the attachments to it is I will go

18  through those to make a determination of what needs to

19  remain sealed.  I believe both sides agree that Exhibits

20  5, 12 and 13 to Document 66 need to remain sealed.  If I

21  understand correctly, the brief itself -- in other words,

22  the statements of Mr. Savage, there's no reason to

23  unseal those.  That's merely an argument.  That's nothing

24  different from what he has said here, and sentencing

25  memoranda generally are sealed.

1       As for the other exhibits, 1 one through 17, they

2   are exhibits to 66.  I will go through those to make a

3   determination about unsealing those.  It is my

4   inclination to unseal as much of that as possible.  The

5   public has a right to know the basis on which this court

6   makes any decisions.  There may be some exceptions to

7   that, and there's some case law to back that up, but I

8   will make that determination on a document by document

9   basis regarding those exhibits.

10      Mr.  Savage.

11      MR.  SAVAGE:  Just Briefly.  On this point, Your

12  Honor, I would ask, when the court makes that review, if

13  you would refer to the factual resume which is already

14  unsealed in the public domain as Document 51.  All of

15  those factors, all those things that were mentioned in

16  the government's memorandum and those exhibits, are also

17  in the public domain because Document 51 is unsealed.

18      THE COURT:  Well that's a very significant part of

19  that review, Mr.  Savage.

20      MR.  SAVAGE:  Yes, Your Honor.  And I would note

21  that even though we disputed the conclusion that all of

22  the facts that support that -- many of the facts that

23  support the conclusion in the factual resume, such as

24  paragraphs five through 12, are stipulated by the defense

25  and are already public.

1          THE COURT:  Well that, Mr.  Savage, is part and

2    parcel of the review.  There is no need to remain or

3    maintain the seal on documents that are already in the

4    public domain, particularly if they have any bearing on

5    the actions of this court.  Therefore, I will go through

6    those exhibits, 1 through 17, with the exception of 5, 12

7    and 13, to make a determination whether there is any

8    portion of any of those that needs to remain sealed, even

9    though I will candidly say my default is not to maintain

10   the seal on those documents unless there is some

11   particular reason to do so.

12          MR.  SAVAGE:  Your Honor, just for our record, we

13   -- if you'll recall, we added 18 and 19 so the Court

14   would want to --

15          THE COURT:  They weren't exhibits to Exhibit 66.

16          MR.  SAVAGE:  No.  But they were offered as

17   exhibits in the hearing.

18          THE COURT:  But they were never offered under

19   seal.

20          MR.  SAVAGE:  That's correct, Your Honor.

21          THE COURT:  Anything else, Mr.  Savage or Ms.

22   Sison before we proceed?

23          MR.  SAVAGE:  Your Honor, if I can make one

24   comment about the argument the defendant -- you know,

25   I've worked with Ms. Sison for a long time and I respect

everything she says.  And when she says something, you
can take it to the bank.  One of the things I think the
finding of the Court, even though she doesn't appeal,
there is every chance that after this court sentences,
especially if it is the agreed sentence that is rendered,
somebody is going to question her.  And the record in
this case needs to be absolutely complete in the findings
of this court.  So in the event that there is a motion
under 2255 attacking the representation of Ms. Sison, we
want a full record.  And I think that's a good reason to
have a finding as well.

    THE COURT:  Mr.  Sullivan, I am being called on to
make a determination of whether or not to accept the
agreed sentence in this case but, before I do that, you
have an opportunity to address the Court and to tell me
anything that you feel I should know before I make the
decisions that I am called upon to make in this case.  So
if you have something that you would like to say to the
Court at this time, this is your opportunity.

    THE DEFENDANT:  Yes.  I just want to address.
Mr.  Savage likes to yell a lot and make me seem like the
bad person I'm not.  But he says that undercover agent
might be someone interested in ISIS, but that's not true.
The undercover agent said that he was helping them
online.  So that's another lie of his.  And I just want

1   to say that, you know, you can't judge me.  You don't

2   even know me, you know.  Most people here, well, I'm sure

3   they'd like me if they actually knew me.  And, you know,

4   I don't -- I mean, yeah, I don't -- I don't -- I'm not a

5   troublemaker, and I'm -- I don't cause problems for

6   anybody.  You know, things just happened.

7        But the thing that I'm a cold-blooded murderer is

8   a total lie.  I'm not just going to do anything to

9   anybody.  That's a complete lie.  And I think it's

10  hypocrisy and double standards because, like, I was

11  listening on the BBC radio a couple of days ago and in,

12  like, 1982 this guy had a bachelor party, Vincent Chin, a

13  Chinese guy, and these two guys killed him with a

14  baseball bat and they didn't get any time for it at all.

15  And they said these guys are clean cut guys and they

16  don't need to go to jail.  So you can kill an innocent

17  Chinese man four days before his wedding and it's okay.

18  But when somebody else -- when other things happen, then

19  it's not okay.  And I think there's much hypocrisy and

20  double standards.  You know, you can kill some people and

21  you're not a murderer and other people and you're a bad

22  person.  But I just want to make it fully clear that I'm

23  not a bad person.  And I know for a fact that a lot of

24  people that would like me out.

25       And, you know, a life sentence isn't justified at

1   all, you know.  Like, if I was out today, I wouldn't

2   cause any problems.  And, yes, I'm a Muslim and, you

3   know, Islam is Islam.  People can change it to suit their

4   needs or desires.  And but I just -- things just

5   happened, and I should have never been moved down here to

6   Morganton.  And I really just -- on the outside, I really

7   just wanted to get married and stuff but I was -- I had a

8   lot of like -- I used to be really shy before, and that

9   was -- that caused problems, but I'm better with that

10  now.  And, yeah, I just don't want people to misjudge me.

11  That's all I have to say.  Thank you.

12          THE COURT:  Thank you, Mr.  Sullivan.

13          The question before the Court today is whether the

14  Court will accept the agreed upon sentence that is set

15  out in the plea agreement that has been entered into

16  between the parties and has been presented to this court

17  pursuant to Rule 11(c)(1)(C) of the Federal Rules of

18  Criminal Procedure.  The plea of the defendant has

19  already been taken and has already been accepted by the

20  Court, subject only to the question of whether or not as

21  a part of this proceeding that we are having here today

22  the Court will find that the agreed sentence is an

23  appropriate sentence in light of the factors for

24  sentencing under the statute Section 3553(a).

25          So I will go through those factors and, to the

1  extent that I need to, make any findings regarding those

2  factors I will make them as part of this analysis.

3  First, I start with the nature and circumstances of the

4  offense under Section (a)(1) and the seriousness of the

5  offense under Section (a)(2)(A).  And, here, looking at

6  the count of conviction, the attempted act of terrorism

7  transcending national boundaries.  That is what I look at

8  with regard to these two factors.  And the offense here,

9  the attempted act of terrorism, is not only the planning

10  of a mass murder but the taking of affirmative steps to

11  effectuate that mass murder.

12      Now the -- as the record clearly shows, and the

13  parties have agreed, and the Court will find that the

14  plan was something very closely akin to what has come to

15  be called the "Orlando Massacre."  It was similar in many

16  respects in that it was intended to take out and kill as

17  many people as possible in a social environment.  But

18  there are certain differences between that attack and

19  what was planned here because, here, the planning was for

20  an attack that was stealthy, that was silent, that the

21  defendant had made his plans and had actually procured a

22  silencer for his firearm, that he had a mask to hide his

23  identity, that he wanted to act in a silent way so as to,

24  so to speak, have more sitting duck victims in order to

25  kill more people but, also, to do so in a stealthy way

with the hope of escaping to have an opportunity to live
and kill again.

I see that as an attempted act of terrorism that
is cold and calculated, needless to say, despicable but
also cowardly. A cowardly way to plan mass murder while
hiding behind a mask, hiding behind a silencer. Those
factors -- all of these facts that I find -- and I
believe all of these facts have been agreed upon by the
parties -- show me that the factors for the nature and
circumstances of the offense, and the seriousness of the
offense, weigh very heavily in favor of a very lengthy
sentence and weigh very heavily in favor of accepting the
agreed sentence of life imprisonment as set out in the
11(c)(1)(C) plea agreement.

I next turn to the factors under Sections
(a)(2)(B) and (a)(2)(C). Namely, that the Court must
fashion a sentence that provides adequate deterrence to
criminal conduct and protects the public from further
harm from the defendant. Of course, with regard to
deterrence, there are two factors. There is specific
deterrence as well as general deterrence. But here,
looking at the specific deterrence of this defendant,
looking at the evidence that is agreed upon that the
defendant acted in such a cold and calculated manner such
as to manifest a disrespect and a disregard for human

1    life, and not just a disrespect and disregard for human

2    life but innocent human life.  Those who would be in a

3    social setting, who had never done anything to the

4    defendant or to anyone ever associated with the

5    defendant, but simply to be the victims, to make a point.

6    The cold nature, the calculated nature, the disregard and

7    disrespect that that manifests, I believe, is something

8    that specifically needs to be deterred with a lengthy

9    sentence.  Likewise, it shows that the public needs to be

10   protected from that.

11        And the public needs to be protected not just with

12   specific deterrence but with general deterrence.  In

13   other words, for anyone who is out there who is a

14   prospective warrior in what the defendant here saw as his

15   holy war need to understand that law enforcement in this

16   country has significant resources and that the chances of

17   being caught, short of committing such acts, are very

18   high, and that the sentences that are received when

19   caught not only are very harsh and very lengthy but must

20   be.  Because anyone who is in that situation, who plans

21   to perpetrate such acts, are not martyrs.  They're

22   criminals.

23        Therefore, when looking at these two factors for

24   sentencing, adequate deterrence and the protection of the

25   public, once again, I see both of these factors as

1  weighing very heavily in favor of a very lengthy sentence
2  and that they weigh very heavily in favor of accepting
3  the agreed upon life term as set out in the 11(c)(1)(C)
4  plea agreement.
5      Next I turn to the factor under Section (a)(2)(A)
6  of fashioning a sentence to promote respect for the law
7  and whether the agreed sentence in fact does promote
8  respect for the law.  Here the defendant in his actions
9  in attempting to effectuate this act of terrorism was
10  acting to fulfill his own concept of propriety or, maybe,
11  his own concept of revenge against what he sees as an
12  unjust society.  But I see that as remarkably
13  self-centered acts.  In fact, self-centered to the point
14  of the defendant even envisioning these acts to be the
15  initiation of what he referred to as the Islamic State of
16  North America, with the defendant there at the forefront
17  of such an organization.  Therefore, the defendant here,
18  by his acts and this attempted act of terrorism,
19  manifested a willingness to impose his own beliefs on
20  others and to kill others and to do it on a massive
21  scale.
22      The defendant acted and even referred to himself
23  in his acts as the "Mujahid."  He saw himself as a
24  jihadi.  But, at root, this manifests a complete
25  disregard, even a rejection of our basic concept of law.

Even our most fundamental laws against murder,
particularly the murder of innocent people.  That's not
just a rejection of American culture or Western culture,
it is fundamentally a rejection of ordered society.  If
one wants to change society or culture or law or policy,
we have a political process in which we all have the
opportunity to participate, and that is part of the
fundamental fabric of our country and of the law.  But to
seek to murder innocent people, particularly on a massive
scale because of disagreement with government or with
culture, is a fundamental rejection of law even of the
concept of law.

        Therefore, in order to fashion a sentence that
promotes respect for the law, these acts of the defendant
and his attempted act of terrorism weigh in favor of a
very lengthy sentence.  In fact, they weigh very heavily
in favor of the acceptance of the life term as set out in
the 11(c)(1)(C) plea agreement.  In addition, I look to
the factor under Section (a)(2)(A):  That the Court
fashion a sentence that provides just punishment and
whether that sentence of life term of imprisonment is
justice under the circumstances.  This is a factor that
is obviously much more nebulous than the more particular
factors that I have already addressed.  But, still,
seeking to murder on a mass scale of completely innocent

people who have never done anything to the defendant
under circumstances such as this is something that
warrants a lengthy sentence and, therefore, I believe
even the factor of a just punishment weighs very heavily
in favor of the acceptance of the life term as set out in
the 11(c)(1)(C) plea.

Now, to this point, I have not addressed at all
the issue that the government has made central to its
argument here today and that is regarding the murder of
Mr. Clark. With regard to that issue, I see that --
first of all, I've obviously already reviewed all of the
factors for sentencing under Section 3553(a) without
reference to the Clark murder and find that they support
the imposition of the life sentence that is set out in
the agreed -- or the agreed life sentence that is set out
in the 11(c)(1)(C) plea agreement. Therefore, I come to
the conclusion that making findings with regard to the
Clark murder in this proceeding is not necessary to the
question that is before this court.

Now the government makes the point that a complete
record is always best. But, here, in light of the fact
that I find that those findings are not necessary for the
Court to answer the question before the court, I will
address the fact that neither side -- or the issue that
neither side has really touched upon, maybe just

1    tangentially, and that -- there is a federalism question

2    here.  Since the findings regarding the Clark murder are

3    unnecessary for this court, I believe that it invades the

4    province of the state tribunal that is to make a

5    determination about the defendant's guilt or innocence

6    concerning the Clark murder and, therefore, it is not

7    appropriately -- not appropriate for this court to make

8    those findings, particularly in a situation such as we

9    have here where the standard of proof with regard to this

10   proceeding for sentencing is a preponderance standard.

11   Whereas, that question really needs to be answered by the

12   state tribunal that has jurisdiction over it on the basis

13   of whether or not it is proven beyond a reasonable doubt.

14        So, for those reasons, I am not making findings

15   one way or the other.  I suppose that at some later date

16   I could make findings if they become relevant to

17   something that this court needs to determine, but at this

18   point, in order to answer the question that is before the

19   Court, I do not need to make those findings and therefore

20   will not make any findings one way or the other

21   concerning the defendant's responsibility for the Clarke

22   murder.

23        Based on all of the foregoing factors, the Court

24   finds and concludes that the agreed sentence of a life

25   term of imprisonment is fully supported and appropriate

1    under all of the factors that are set out in Section

2    3553(a).  And since that sentence is an appropriate

3    sentence, the Court will accept the 11(c)(1)(C) plea in

4    its entirety and impose the sentence that is set forth in

5    the plea agreement.

6          Is there anything that needs to be addressed

7    before we move on to the imposition of the sentence?

8    Anything for the government?

9          MR.  SAVAGE:  Your Honor, at the appropriate

10   point, when the Court announces sentence, the government

11   would move to dismiss the remaining counts of the

12   indictment.  I'd also note that there is a forfeiture

13   count.  The government seized some $689 and it's the

14   policy of the Justice Department not to pursue forfeiture

15   less than $1,000.  So we'll be returning that to the

16   defendant or to his representative.  Other than that, all

17   the other evidence that's been seized in the case we

18   would retain for use in the state proceeding.

19         THE COURT:  Okay.  Ms. Sison.

20         MS. SISON:  Nothing for Mr.  Sullivan, Your Honor.

21   And we will provide the government with all the lists

22   they provided to us regarding discovery.

23         THE COURT:  Mr.  Sullivan, I need for you to stand

24   please.  Pursuant to the Sentencing Reform Act of 1984

25   and the case of *United States versus Booker*, it is the

1   judgment of this court, having considered the factors

2   noted in 18, U.S.C., Section 3553(a), that the defendant,

3   Justin Nojan Sullivan, is hereby committed to the custody

4   of the United States Bureau of Prisons to be imprisoned

5   for a term of the balance of his life.  This term of

6   imprisonment that is imposed by this judgment shall run

7   consecutively to any term of imprisonment either

8   heretofore or hereafter imposed by this court or any

9   other court in any other matter whether related to this

10  matter or not.

11         The Court calls to the attention of the custodial

12  authorities that the defendant has a history of mental

13  health issues and recommends that the defendant be

14  allowed to participate in any available mental health

15  treatment programs while incarcerated.

16         The Court also recommends that the defendant

17  undergo a pre-assignment study consisting of a

18  psychological and psychiatric evaluation to properly

19  determine the appropriate designation for the defendant.

20         In the event that the defendant is released from

21  imprisonment, the defendant shall be on supervised

22  release for a term of the balance of his life.

23         Within 72 hours of release from the custody of the

24  Bureau of Prisons the defendant shall report in person to

25  the probation office in the district to which he is

released.  While on supervised release, the defendant
shall not commit another federal, state or local crime,
and shall comply with the standard conditions that have
been adopted by the court in the Western District of
North Carolina.  In addition, the defendant shall comply
with the following additional condition.  The defendant
shall participate in a mental health evaluation and
treatment program and follow the rules and regulations of
that program.  The probation officer, in consultation
with the treatment provider, will supervise the
defendant's participation in the program, including but
not limited to provider location modality duration and
intensity.

       The defendant shall take all mental health
medications as prescribed by a licensed healthcare
practitioner.

       It is ordered that the defendant shall pay the
United States a special assessment in the amount of $100.

       The Court finds that the defendant does not have
the ability to pay a fine or interest.  And having
considered the factors noted in 18, U.S.C., Section
3572(a), the Court will waive the payment of a fine and
interest in this case.  Payment of the criminal monetary
penalties shall be due and payable immediately.  The
Court has considered the financial and other information

contained in the presentence report and finds that the

following is feasible.  If the defendant is unable to pay

any monetary penalty immediately, during the period of

imprisonment, payments shall be made through the federal

Bureau of Prisons inmate financial responsibility

program.

Upon release from imprisonment, any remaining

balance shall be paid in monthly installments of no less

than $50 to commence within 60 days of such release until

paid in full.  Throughout the period of supervision, the

probation officer shall monitor the defendant's economic

circumstances and shall report to the Court with

recommendations, as warranted, any material changes that

affect the defendant's ability to pay any court ordered

penalties.

My reasons for the acceptance of the sentence were

as set out in my reasons for accepting the 11(c)(1)(C)

plea agreement.

Ms. Sison, are there any other issues regarding

either the sentence or the judgment that need to be

addressed?

MS. SISON:  No, sir.

THE COURT:  Mr.  Savage, are there any for the

government?

MR.  SAVAGE:  No, Your Honor.  We move, as

previously stated, to dismiss the remaining counts of the
indictment -- superseding indictment.

THE COURT:  And the count of conviction was Count
Nine.  So counts one through eight of the superseding
indictment as to Mr. Sullivan are hereby dismissed.

Mr. Sullivan, you have the right to appeal the
sentence that I have imposed to the Fourth Circuit Court
of Appeals on any grounds that you've not waived.  You
plead guilty pursuant to a plea agreement.  That plea
agreement includes some waivers that may substantially
affect your appeal rights.  So you will need to consult
with your attorney as to what effect those waivers may
have.  However, if you choose to appeal you must file a
written notice of appeal with the clerk of this court
within a period of 14 calendar days following the date of
the entry of the final judgment in this case.  If you
choose to appeal but do not have the funds with which to
appeal, you have previously been determined to be
indigent and therefore you may appeal at government
expense.

Do you understand this right of appeal as I have
explained it to you?

THE DEFENDANT:  Yes.

THE COURT:  With that, this matter is concluded
and the defendant is remanded to the custody of the

1    United States marshal.

2         Marshal, please recess this court until further

3    call.

4                    (Off the record at 10:57 a.m.)

5                           **CERTIFICATE**

6         I, Tracy Rae Dunlap, RMR, CRR, an Official Court
     Reporter for the United States District Court for the
7    Western District of North Carolina, Asheville Division,
     do hereby certify that I transcribed, by machine
8    shorthand, the proceedings had in the case of UNITED
     STATES OF AMERICA versus JUSTIN NOJAN SULLIVAN, Criminal
9    Action 1:16-CR-05, on June 27, 2017.

10        In witness whereof, I have hereto subscribed my
     name, this 12th day of July, 2017.

11

12                    __/S/__Tracy Rae Dunlap__
                      TRACY RAE DUNLAP, RMR, CRR
                      OFFICIAL COURT REPORTER
13

14

15

16

17

18

19

20

21

22

23

24

25